IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| IN RE: SUBPOENA ISSUED BY THE CLERK OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO TO MELISSA BROWN, A RESIDENT OF THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION, | MISC. CIVIL ACTION NO. 2:19-mc-3894-MHT-SMD |

## MOTION TO QUASH OHIO FEDERAL SUBPOENA DIRECTING MELISSA BROWN TO PROVIDE DEPOSITION TESTIMONY IN MONTGOMERY, ALABAMA

Comes now Melissa Brown (hereinafter "Brown"), a resident of the Middle District of Alabama, Northern Division, and, pursuant to Federal Rule of Civil Procedure 45(3)(A)(iii), moves this Honorable Court to quash a witness deposition subpoena issued by the clerk of the United States District Court for the Southern District of Ohio styled *In Re Ohio Execution Protocol*, No. 2:11-cv-1016 (S.D. Ohio). As grounds, Brown would state as follows:

1. On September 3rd a subpoena was issued by the clerk of the United States District Court for the Southern District of Ohio requiring Brown to provide deposition testimony concerning her attendance at several executions while she was acting in her capacity as a newspaper reporter for *The Montgomery Advertiser* newspaper. A copy of the subpoena is attached as

Exhibit A. The subpoena seeks to require Brown to attend a deposition September 27, 2019, at 1 p.m. at the Frank M. Johnson, Jr. U.S. Courthouse Complex.

2. Brown is a resident of Montgomery, Alabama, which is within the United States District Court for the Middle District of Alabama.

3. As the district where compliance with a subpoena is required, this Court has jurisdiction to review a motion to quash the subpoena issued by the Ohio federal district court.

4. *In Re Ohio Execution Protocol*, No. 2:11-cv-1016 (S.D. Ohio) appears to be a case challenging the constitutionality of the execution protocols in the State of Ohio. The challengers in *In Re Ohio*, appear to claim that the execution protocols in Alabama and Ohio are similar. Based upon communications with Paul R. Bottei of the Office of Federal Public Defender in Columbus, Ohio, it is clear the subject and purpose of the deposition of Ms. Brown will be to question Ms. Brown about what she witnessed while attending the executions of Domineque Ray, Christopher Lee Price and Michael Samra, all of which were conducted by the Alabama Department of Corrections in 2019. Brown was one of more than a dozen or so witnesses to the execution, which typically include the inmate's attorneys, spiritual advisors and family members, the victim's family members, various state officials,

DOC officers and a DOC spokesperson. Upon information and belief representatives of the Attorney General's Office were also present.

5. Ms. Brown is protected by CODE OF ALABAMA 1975 § 12-21-142 (hereinafter the "Alabama Reporter's Shield Law") which provides;

> "No person engaged in, connected with or employed on any newspaper, radio broadcasting station or television station, while engaged in a newsgathering capacity, shall be compelled to disclose in any legal proceeding or trial, before any court or before a grand jury of any court, before the presiding officer of any tribunal or his agent or agents or before any committee of the legislature or elsewhere the sources of any information procured or obtained by him and published in a newspaper, broadcast by any broadcast station or televised by any television station in which he is engaged, connected with or employed."

6. Reporters gather and report news. The above provision recognizes the public policy benefits of allowing members of the media to protect the sources of any information published by the news organization by which they were employed.

7. Brown has, in fact, obtained and published information from confidential sources relating to executions in Alabama and must protect the sources of that information.

8. Many matters published by news organizations become the subject of litigation weeks, months or years later. Some publications then report on the ongoing litigation. Litigants in litigation often shackle reporters' ability to gather the news when they attempt to harness a reporter's

3

newsgathering capabilities for their own litigation purposes. Journalistic autonomy and independence must be protected if the press is to fulfill its vital role of gathering and reporting news. A reporter's ability to secure the trust of news sources, and the reporter's ability to attend and observe news events, turns on the public's perception of reporters as agents for an independent press and not connected with other interests.

9. Brown's status as one reporter among several other (non-reporter) witnesses to each execution, establishes a qualified "reporter's privilege" protecting her from being forced to testify about information which can readily be acquired from other sources. This privilege was last considered by the United States Supreme Court in 1972 in *Branzburg v. Hayes*, 408 U.S. 665 (1972). In that case three reporters were subpoenaed to testify about their interviews and photos with The Black Panthers. One of the reporters, Paul Branzburg, witnessed members of the group using hashish and preparing it for sale. There were no other sources for that information without Fifth Amendment rights.

10. Justice Lewis Powell issued a concurring opinion explaining the decision recognized a qualified privilege calling for balancing the First Amendment rights of reporters with the subpoenaing parties' need for disclosure. 408 U.S. at 710. He said the decision should be made on a case-by-

case basis. Id. He said: "Indeed, if the newsman is called upon to give information bearing on a remote and tenuous relationship to the subject of the investigation...he will have access to the court on a motion to quash...." Id.

11.   The qualified privilege was accepted in the old Fifth Circuit in *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726 (5th Cir. 1980), cert. denied, 450 U.S. 1041, 101 S.Ct. 1759 (1981) (privilege overcome in libel case concerning information from a confidential source) and by the Eleventh Circuit in *U.S. v. Caporale*, 806 F.3d 1487, 1504 (11th Cir. 1986) (privilege upheld in case where reporters were alleged to have received information possibly supporting a jury tampering claim but FBI agents with same information testified). The most recent Eleventh Circuit case followed *Miller* but upheld the privilege even in a libel case where the defendant was protecting the source of the libelous statements where discovery would likely lead to the name of the source. *Price v. Time, Inc.* 416 F.3d 1327, 1346-48 (11th Cir. 2005).

12.   In this case Ms. Brown wrote articles about the executions of Ray, Price and Samra. Copies of the articles are attached as Exhibits B-D. She, and presumably all present, had to sign in. There are separate viewing rooms from the victim's family and the prisoner's family. Ms. Brown was present in the state's witness room. With regard to Ray's witness room there were three

witnesses, a spiritual advisor and two lawyers. As for Price the victim's widow, two daughters, two grandsons and a nephew were present. For Price, his lawyer was present. Finally, regarding Samra, there were six family members serving as witnesses for the victim and two attorneys and a spiritual advisor for Samra. There were several additional witnesses from the Alabama Department of Corrections.

13. A case from the Supreme Court of Florida quashing subpoenas issued under almost exactly the same circumstances presented here supports quashing the subpoenas issued to all the reporters involved in this case. In *Muhammad v. State*, 132 So.3d 176 (Fla. 2013), reporters who witnessed and reported on executions were subpoenaed to give testimony allegedly pertaining to the constitutionality of lethal injection procedures. The trial judge quashed the subpoenas. 132 So.3d at 189.

14. On appeal, the Florida Supreme Court found that to overcome the statutory privilege, the party issuing the subpoena has to make a clear showing (a) the information was relevant to unresolved issues, (b) the information could not be obtained from alternative sources, and (c) a compelling interest exists for requiring the disclosure. Id. Citing the Eleventh Circuit's discussion of a "compelling need" in *U.S. v. Caporale*, supra, the Florida Supreme Court noted the information must be "highly relevant, necessary to the proper

presentation of the case, and unavailable from other sources." 132 So.3d at 190 quoting *Caporale* at 806 F.2d at 1504. The Florida Supreme Court held:

> We conclude that the circuit court did not abuse its discretion in quashing these two subpoenas based on the qualified privilege in section 90.5015. There were twenty-eight witnesses to the Happ execution. Muhammad failed to explain why he could not discover the identity of even one of those witnesses other than through public records requests that were denied him. Further, his own expert witness read the news articles in question and was aware of the reports of Happ's movements after introduction of midazolam hydrochloride in the lethal injection procedure. Dr. Heath did not testify that the movement reported in the articles indicated Happ was conscious or that the midazolam hydrochloride did not work as anticipated. He testified instead that movement does not necessarily equate with consciousness. Further, Dr. Evans gave similar testimony. Thus, Muhammad failed to demonstrate a compelling interest in disclosure of the information gathered by the news reporters in the scope of their employment, and failed to demonstrate that the information, even if relevant to the efficacy of midazolam hydrochloride, could not have been obtained from alternate sources.

*Muhammad v. State*, 132 So.2d at 190–91.[1]

15. Caselaw supports the view that the qualified privilege must be viewed on a case-by-case basis weighing the newspersons' First Amendment rights against the rights of the party seeking the testimony in their case. Here, the facts do not support defeat of the privilege.

---

[1] The Florida Supreme Court also agreed with the trial court's decision not to admit the articles themselves as hearsay. 132 So.2d at 191.

16. Like the *Price v. Time* case, the party seeking the deposition here could likely obtain the same eye-witness information of the execution if discovery were taken from other available sources.

17. The reporter's privilege was not created to establish newspersons as a favored class, but rather to protect the public's right to know. Because the purpose of the qualified privilege is to assure to the fullest extent possible the free flow of information to the public, the privilege applies to all information acquired by a reporter in gathering the news, regardless of whether the information is confidential. *North Carolina v. Smith*, N.C. Supr., 13 Med. L.Rptr. (BNA) 1940 (1987); *Maughan v. NL Industries*, 524 F. Supp. 93 (D.D.C. 1981); *In re Schuman*, 552 A.2d 602 (N.J. Supr. 1989). A forced inquiry into unpublished information inevitably intrudes upon editorial decisions and can seriously impair the gathering and publication of news. Such compulsory process necessarily has a chilling effect on First Amendment freedom. *Sweezy v. New Hampshire*, 354 U.S. 234, 245 (1957).

18. Even if no confidential source information were involved, this constitutional privilege would apply. This privilege is designed to lift the chilling effect enforcement of such subpoenas would have on the free flow of information. *United States v. Blanton*, 534 F. Supp. 295, 297 (S.D. Fla. 1982); *In re: Consumers Union*, 495 F. Supp. 582 (S.D. N.Y. 1980); *Altemose*

8

*Construction Co. v. Building & Construction Trades Council*, 443 F. Supp. 489 (E.D. Pa. 1977); *United States v. Cuthbertson*, 630 F.2d 139 (3rd Cir. 1980) (Cuthbertson I), cert. denied, 449 U.S. 1126, reversed, 651 F.2d 189 (3rd Cir.), cert. denied, 454 U.S. 1056 (1981). Indeed, "[i]t is only by preserving the right of the press to avoid being made a part of a controversy merely as a result of its performing its constitutionally-favored duties that the press may avoid the 'chilling effect' that the enforcement of this subpoena would have on the flow of information to the press and to the public." *North Carolina v. Smith*, 13 Med.L.Rptr. (BNA) at 1941.

19. Reporters are converted to investigative arms of litigants whenever the files of unpublished information are subject to discovery. This conversion takes place whether or not the information in those journalists' files was obtained confidentially. If the general population perceives that talking to the press is indirectly talking to the court and lawyers, reporters may well be shunned by sources which would have trusted them and will be denied access to meetings, accident scenes, and other events to which they otherwise would be admitted.

20. Unlike ordinary citizens, reporters are routinely at sites of events that are likely to become the subject of litigation, such as, for example, executions. Reporters also cover criminal and civil cases after they are

initiated. Whether the journalist is covering a serious automobile accident, reporting on a crime, investigating the scene of an airplane crash, gathering investigative material for a report on governmental malfeasance, reporting on a hearing in court, or providing photographs as part of these journalistic activities, the subjects of the reporters' work are likely to show up in a courtroom setting. As a result of this exposure, litigants will subpoena reporters or their materials because reporters, unlike many other witnesses, are easy to locate and serve with process.

21. If journalists are unprotected from summary demands to testify or produce their work product in proceedings in which they are not even parties, subpoenas to the press will become a routine element of litigation. Reporters, photographers, and editors would regularly be summoned to appear at depositions, before grand juries and at trials. Similarly, the production of a journalist's notes, drafts and negatives, tapes and film, often in massive quantities, would become commonplace. See, e.g., *In re: Consumers Union*, 495 F. Supp. at 586, n. 1.

22. Here, the facts relating to witnessing executions do not support enforcement of a party-issued subpoena to a working journalist concerning an execution she witnessed. Upon information and belief, a dozen or more persons witnessed the executions Ms. Brown attended. The list of their names

is an Alabama DOC record. There has been no showing the information sought is not available from other witnesses who were not there as part of their duties as reporters.

WHEREFORE, Brown moves this Court to quash the subpoena issued at the request of the Office of the Federal Public Defender in Ohio or to grant a protective order based upon the Reporter's Shield Law and/or the Reporter's Privilege.

/s/ Dennis R. Bailey
Dennis R. Bailey
J. Evans Bailey
Attorneys for Melissa Brown

Of counsel:
RUSHTON, STAKELY, JOHNSTON & GARRETT, P.A.
184 Commerce Street
Post Office Box 270
Montgomery, Alabama 36101-0270
(334) 206-3234 (phone)
(334) 481-0031 (fax)
drb@rushtonstakely.com (e-mail)
ebailey@rushtonstakely.com (e-mail)

11

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing document upon the following counsel by emailing them at the addresses shown in the subpoena on this the 6th day of September 2019.

    Paul R. Bottei
    Paul-bottei@fd.org
    Allen L Bohnert
    Allen_bohnert@fd.org
    Office of the Federal Public Defender
    10 West Broad Street, Suite 1020
    Columbus, Ohio, 43215
    Phone: (614) 469-2999.

                _____
                Of counsel